# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 11-107** |
| **EVANS LEWIS, ET AL.** | **SECTION: "G" (1)** |

## ORDER AND REASONS

Before the Court is Defendant Evans Lewis's Motion to Suppress Suggestive Identification,[1] wherein he alleges that the Government obtained a witness identification of Lewis in violation of the Due Process Clause. He thus seeks suppression of the identification. The Court has considered the parties' filings, the oral arguments presented at hearing, the testimony at the evidentiary hearing, the record, and the applicable law. For the reasons that follow, the Court will deny the motion.

## I. Background

### A. Procedural Background

On January 19, 2012, Lewis was indicted, along with eight co-defendants, in an alleged conspiracy to distribute heroin.[2] The same indictment charged Lewis and co-defendant Gregory Stewart with the May 24, 2011 murder of Gregory Keys in relation to the commission of a drug-trafficking crime.[3] Lewis, Stewart, and co-defendants Terrioues Owney, Darick Wallace, and Parnell Watts are scheduled to be tried by jury on January 21, 2014. Lewis filed the pending motion on August 21, 2013, arguing that Smothers's identification of Lewis as one of his assailants should not

---

[1] Rec. Doc. 509.

[2] Rec. Doc. 208 at 1–2.

[3] *Id.* at 5.

1

be admitted at trial.[4] The Government filed a response in opposition on September 18, 2013.[5] The

Court held oral argument on the motion on September 26, 2013.[6] Supplemental briefs by both sides

followed.[7] Ultimately, the Court granted Defendant's motion for an evidentiary hearing,[8] which was

held on October 23, 2013.[9] After the hearing, Defendant filed two post-hearing briefs and the

Government filed one regarding this matter.[10]

### B. Factual Background

Allegedly just before 10 p.m. on May 24, 2011, officers with the New Orleans Police

Department ("NOPD") arrived at the scene of a shooting that an anonymous caller had reported to

the NOPD.[11] It is also alleged that other officers were soon thereafter sent to an intersection

approximately 2 miles from the scene of the shooting, where a car driven by Kendrick Smothers had

been in an accident.[12] Smothers had suffered multiple gunshot wounds. His passenger, Gregory

Keys, had also been shot multiple times. Keys was unresponsive and pronounced dead at the scene.[13]

While still at the scene, Smothers allegedly told an NOPD officer where the shooting had occurred,

that one of the shooters was a person he knew as "Rabbit," and that both Rabbit and his accomplice

---

[4] Rec. Doc. 509.

[5] Rec. Doc. 553.

[6] Rec. Doc 581.

[7] Rec. Docs. 590, 594, 607

[8] Rec. Doc. 578.

[9] Rec. Doc. 615.

[10] Rec. Docs. 625, 634, 638.

[11] Rec. Doc. 509-5 at 11.

[12] *Id.* at 12.

[13] *Id.*

were traveling in a black Infiniti M35.[14] One NOPD officer noted that Smothers said something about "G-Strip."[15] It is now claimed that that term is a reference to Gallier Street in New Orleans.

It is further alleged that the morning after the shooting, an FBI agent contacted NOPD Detective Tim Bender and informed him that the FBI had information related to the shooting of Smothers and Keys.[16] Two FBI agents subsequently met with Detective Bender and informed him of their ongoing investigation of an alleged drug-distribution conspiracy. They stated that one of their targets, Gregory Jaymar Stewart, was known as "Rabbit" and lived on Gallier Street.[17] Allegedly, based on this information, Bender and the FBI agents decided to interview Smothers at his intensive care room at LSU Interim Hospital. They arrived at around noon on May 25, 2011, the day after the shooting.[18]

Smothers was joined at the hospital by his attorney, and Bender informed them that he and the FBI agents were there to discuss the shooting.[19] Allegedly, Smothers informed Bender and the agents that he and Gregory "Smokey" Keys had driven to the scene of the shooting to meet with "Rabbit" to collect money that he owed Smothers.[20] At that time, it is alleged that Smothers stated that Rabbit owed him money related to a sale of an All-Terrain Vehicle ("ATV").[21] Smothers said that when he pulled up to the scene, he saw Rabbit and another man known as "Evans" in a black

---

[14] *Id.* at 12–13.

[15] *Id.* at 18.

[16] *See id.* at 21.

[17] *Id.* at 22.

[18] *Id.* at 23.

[19] *Id.*

[20] *Id.*

[21] *Id.*

3

Infiniti M35, which Smothers parked behind, with both cars facing the same direction.[22] Allegedly, Smothers said that he stepped out of the car and walked toward the Infiniti, but "as he was alongside the fender" of his own car, he looked over to the right and saw "Evans" leaning over the hood holding a handgun.[23] Allegedly, this person fired the gun, striking Smothers in the face; Smothers immediately fell to the ground and went for his own gun, stuck in his waistband.[24]

The Government claims that Smother told authorities that as he heard numerous shots, he began to crawl toward the driver's side door of his car. He claims that he was again hit by a bullet.[25] The NOPD narrative reports that Smothers next saw Rabbit standing over Smothers with an AK-47 style assault rifle and that Rabbit fired many shots at Smothers, hitting him in the arm and leg.[26] A report the FBI compiled after Smothers's May 25, 2011 interview states that both shooters had walked over to Smothers and shot at him while he was lying on the ground.[27] Allegedly, after firing several rounds, the shooters fled the scene.[28]

The Government claims that after Smothers described the shooting, Detective Bender produced a "six-pack" photographic lineup of five individuals and Gregory Stewart.[29] The Government further claims that Smothers looked at the pictures for about one minute before stating

---

[22] *Id.*

[23] *Id.* at 24.

[24] *Id.* The Court notes that Smothers's testimony during the suppression hearing differed from this statement in that Smothers testified his gun was in his lap and that he placed his hand on the gun as he was getting out of the car.

[25] *Id.*

[26] *Id.*

[27] Rec. Doc. 509-6 at 5.

[28] Rec. Doc. 509-5 at 24.

[29] *Id.* at 25.

that he did not recognize any of the men.[30] Then allegedly one of the FBI agents began to ask Smothers questions related to the FBI's ongoing drug investigation, but after a few questions Smothers's attorney and the FBI agents briefly left the room "to discuss the line of questioning."[31] Allegedly, when the agents and Smothers's attorney returned, Detective Bender offered to reproduce the six-pack lineup for Smothers's review.[32] Smothers replied, "I don't have to look at it, picture 4 is Rabbit."[33] The detective then produced the lineup, and Smothers pointed out picture four, which identified Stewart.[34]

The Government says that Detective Bender next asked if Smothers knew the full name of the person he had referred to as "Evans." Smothers did not know the man's last name, but when asked, Smothers described "Evans" as being "chubby" and having "dreads."[35] The NOPD narrative states that "[a]t that time Agent Wood produced a single black and white Louisiana Department of Motor Vehicles photograph" of Evans Lewis and held it in front of Smothers.[36] According to the NOPD narrative, when the agent asked if Smothers knew the person in the photograph, Smothers responded that the person was "Evans."[37] The FBI report states that Smothers was shown Lewis's driver's licence photograph after he had been shown two other driver's license photographs of other

---

[30] *Id.*

[31] *Id.*

[32] *Id.* at 26.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *See id.*; Rec. Doc. 509-6 at 3.

[37] Rec. Doc. 509-5 at 27.

known associates of Stewart's, both of whom Smothers identified but not in relation to the shooting.[38]

After Smothers identified Evans Lewis as the man that he knew as "Evans," allegedly Smothers told the detective and FBI agents that his meeting with Stewart was not related to the sale of an ATV.[39] Instead, he stated that "Rabbit" owed him $5,500 for an ounce of heroin that Smothers had "fronted" Stewart.[40] The U.S. Marshals Service arrested Lewis on June 6, 2011, in Hancock County, Mississippi.[41] At a follow-up interview with Detective Bender on June 13, 2011, Smothers allegedly identified Lewis again as one of the two shooters who had attacked him.[42] The detective again showed Smothers a single picture of Lewis, the back of which Smothers signed in acknowledgment.[43] According to the Government, during this interview, Smothers asserted that he had known Lewis for about two to three months prior to the shooting.[44]

## II. Parties' Arguments

### A. Defendant's Motion to Suppress

Lewis moves for suppression of the photographic identification by Smothers, claiming that it was impermissibly suggestive for the Government to present Lewis's photograph "in the absence

---

[38] Rec. Doc. 509-6 at 3.

[39] Rec. Doc. 509-5 at 27.

[40] *Id.*

[41] *Id.* at 29.

[42] Rec. Doc. 509-7 at 2.

[43] *Id.*

[44] *Id.* at 3.

of an array"[45] and that "there was no exigency in this case which justified or otherwise excused" the procedure used,[46] making the identification a violation of the Due Process Clause of the Fifth Amendment.

Additionally, Defendant notes that Smothers's identification was unreliable. Defendant asserts that the lighting at the scene of the shooting was "very limited;"[47] that Smothers had been shot several times, including in the face; and that Smothers probably was "under the influence of drugs at the time of the shooting."[48] Moreover, Defendant points to "inconsistencies" in Smothers' statements to police.[49] Finally, Defendant avers that Smothers "was likely highly medicated" at the time of identification, "given that he had just come out of surgery at the Intensive Care Unit."[50]

## B. The Government's Opposition

In opposition to the motion to suppress, the Government argues that the Court need not even consider the reliability of the identification to determine whether there was a substantial likelihood of irreparable misidentification because Lewis has not met his burden to establish that (1) there was any improper police influence; (2) that the use of a single photograph was suggestive; and (3) that the evidence is unfairly prejudicial. The Government states that the FBI agent who presented Lewis's photograph to Smothers was not seeking to identify Smothers's attacker but only "persons

---

[45] Rec. Doc. 509-1 at 5–6.

[46] *Id.* at 6.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 7.

[50] *Id.*

known to associate with Gregory Stewart."[51] Furthermore, the Government highlights the fact that the agent showed "many photographs to Smothers without suggesting that an individual was a shooter."[52] To the contrary, Smothers "volunteered that Lewis was the second shooter after the agent had shown him seven or so photographs of other individuals connected in one way or another to Stewart."[53]

Moreover, the Government contends that Smothers stated that he had known Lewis for several months.[54] From this, the Government concludes, "[T]his was not a single photo identification of a complete stranger; rather, it was the identification of a known assailant from a stack of photographs."[55] The Government notes that a single photograph identification is not unduly suggestive when the victim already knows the suspect.[56] The Government further notes that suggestive identifications are permissible when "prompted by the exigencies of a witness's injuries and the investigation."[57] Here, Smothers had been shot in the face, an injury for which he had to undergo surgery. Furthermore, his assailants "were still at large, and the agents sought to interview Smothers as soon as possible after the shooting to apprehend dangerous individuals," thus warranting the expediency the Government used to identify Lewis.[58]

---

[51] Rec. Doc. 553 at 6.

[52] *Id.* at 6–7.

[53] *See id.* at 5, 7.

[54] *Id.* at 7.

[55] *Id.*

[56] *Id.* (citing *United States v. Hefferon*, 314 F.3d 211 (5th Cir. 2002)).

[57] *Id.* at 8 (citing *Herrera v. Collins*, 904 F.2d 944 (5th Cir. 1990)).

[58] *Id.* at 9.

Finally, the Government points to the circumstances of the identification and crime. The facts of each suggest the reliability of Smothers's identification. First, Smothers's attorney was present at the time, which, from the Government's view, establishes that the identification procedure could not have been impermissibly suggestive.[59] As for the interview itself, Smothers accurately identified other individuals known to associate with Stewart.[60] Likewise, Smothers accurately described Lewis's appearance before being shown the photograph and did not hesitate in either naming or identifying him.[61] The Government points out that, far from dazed at the interview, Smothers "even correctly identified the firearms that each man used" and the make, color, and model of Stewart's vehicle,[62] suggesting that the effects of the surgery in no way affected him. Finally, the Government notes that the identification occurred less than 24 hours after the shooting.[63]

## C. Defendant's Supplemental Brief

In his supplemental brief, Lewis calls into question the "deeply inconsistent accounts of the identification procedures" given by the NOPD and the FBI."[64] Among other discrepancies, Defendant notes that the NOPD account states that the identification happened prior to Smothers undergoing surgery whereas the FBI account places the time shortly after it.[65] This and other discrepancies "undermine the persuasiveness of the Government's assertions that the identification

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 13.

[62] *Id.* at 12.

[63] *Id.*

[64] Rec. Doc 590 at 1.

[65] *Id.* at 2–4.

procedure was not suggestive . . . ."[66] More importantly, Defendant argues that these discrepancies suggest that Smothers's "identification of Mr. Lewis was not reliable, and that there was no exigency that required the single photograph procedure . . . ."[67] Even viewing these inconsistencies as innocent misstatements, Lewis emphasizes that either account of the identification procedure shows it to have been unduly suggestive and, therefore, impermissible.[68]

### D. Government's Supplemental Brief

In its supplement brief in opposition, the Government, relying on *Perry v. New Hampshire*,[69] argues that because there was no police misconduct here, the Court need not look to the reliability of the identification.[70] Furthermore, the Government contends that even if Lewis establishes that the police violated the Fifth Amendment with an unduly suggestive identification procedure, the conduct was justified "considering the exigencies of the investigation."[71] As the Government notes, "Kendrick Smothers had just come out of surgery, having been shot multiple times the previous night, and the two perpetrators of a homicide were still at large and possibly fleeing the jurisdiction."[72] Because the circumstances made a "prompt identification" necessary, the Government argues that "a one-photo identification was not a violation of due process."[73]

### E. Defendant's Post-Hearing Brief

---

[66] *Id.* at 5.

[67] *Id.* at 6.

[68] *Id.* at 7.

[69] 132 S. Ct. 716, 723.

[70] Rec. Doc. 594 at 1.

[71] *Id.* at 3.

[72] *Id.*

[73] *Id.*

In the post-hearing brief, Lewis retreads his three primary attacks on the identification: (1) that the procedure was unduly suggestive; (2) the there was no justifying exigency; and (3) that the identification is not reliable.[74] Defendant relies on the testimony of FBI Agent Wood, who stated that the identification procedure was intended to have Smothers identify Lewis as the second shooter.[75] Specifically, Defendant points to Agent Wood's statement that, "[Smothers] had mentioned Evans, by first name, not nicknames, so I intentionally put Evans well into the stack . . ."[76]

As for Defendant's second proposition, that there was no exigency, Defendant points to, in addition to the testimony of Agent Wood, that of Detective Bender. As Defendant understands these two men's testimony, there was no urgency on the part of law enforcement officials on account of Smothers's health since he was listed as being in "stable condition."[77]

Finally, to attack the reliability of the identification, Defendant relies on Smothers's own testimony. According to Defendant, Smothers's account of the identification conflicts with that offered by the Government. While Agent Wood and Detective Bender claimed Smothers identified Lewis by name, Smothers stated at the evidentiary hearing that he did not know Evans's name at that point.[78] Additionally, Defendant points to Smothers's drug use that day, which included smoking a "blunt" of marijuana shortly before the meeting where the shooting occurred.[79] On top of that, Defendant contends that Smothers's testimony is motivated by a desire to avoid criminal

---

[74] Rec. Doc. 625 at 2.

[75] *Id.* at 7.

[76] October 23, 2013 Hearing Transcript at 163.

[77] Rec. Doc. 625 at 6–7.

[78] *Id.* at 3.

[79] *Id.* at 9.

responsibility since he has admitted to drug use, drug trafficking, and discharging an illegal firearm.[80] Lastly, Lewis points to inconsistencies in Smothers's various accounts. These call into question his reliability.[81]

### F. Government's Post-Hearing Brief

In its post-hearing brief, the Government emphasizes that the burdens of production and persuasion are on the movant in a suppression hearing. The Government contends that Defendant does not carry his burden to establish the existence of improper police influence or the suggestiveness of the photographic identification. Therefore, the inquiry ends and the issues of reliability of the identification and credibility of Smothers must be resolved by the jury.[82]

The Government further argues that even if Defendant carries his burden of showing the single photographic array was unduly suggestive, it was nonetheless proper under the exigent circumstances.[83] First, the Government points to Smothers's grave injuries, which only in hindsight were less serious than they first appeared. Smothers had been shot at least eight times, including in the face.[84] Moreover, the perpetrators of the shooting were still at large and presumably armed and dangerous.[85]

Finally, the Government avers that, even if the Court determines that the identification procedure was impermissibly suggestive, the facts the Court should consider with regard to

---

[80] *Id.* at 9–10.

[81] *Id.* at 10–11.

[82] Rec. Doc. 638 at 1–2.

[83] Rec. Doc. 638 at 2.

[84] *Id.*

[85] *Id.* at 3.

suppression weigh in favor of admitting the identification because there is not a substantial likelihood of misidentification in this case.[86] Specifically, the Government notes that Smothers had known Lewis for at least several months prior to the incident through his interactions with Stewart.[87] Additionally, the Government argues that identification was reliable under each of the *Neils v. Biggers*[88] five factors. First, Smothers had the opportunity to view the perpetrator during the crime; second, Smothers was attentive during the encounter because he was in a dangerous neighborhood on a drug transaction; third, Smothers gave an accurate description of the perpetrator prior to identification; fourth, Smothers expressed complete certainty about his identification of the perpetrator; and, fifth, less than a day passed between the shooting and Smothers's identification.

### G. Defendant's Second Post-Hearing Brief

In his second post-hearing brief, Lewis disputes the Government's contention that the Government did not promise Smothers immunity in exchange for his identification and testimony. Defendant avers that Smothers received an immunity agreement for his cooperation with law enforcement, which reads: "[T]he U.S. Attorney's office has agreed that no statements or other information provided by Smothers as a result of his cooperation with law enforcement authorities would be used against him in any criminal case, except in a prosecution for perjury, obstruction of justice or making false statements."[89] Based on this, Defendant asserts that "[t]he fact that Smothers has an immunity agreement that allows him to cooperate and evade criminal responsibility for his

---

[86] *Id.* at 7.

[87] *Id.*

[88] *Neil v. Biggers*, 409 U.S. 188 (1972).

[89] Rec. Doc. 634 at 9.

actions–while testifying to the contrary–undermines both his credibility and the reliability of his information."[90]

### III. Law and Analysis

#### A. Applicable Law

The Supreme Court has recognized that the Due Process Clause of the Fifth Amendment guarantees a defendant's right to exclude, as unreliable, identification testimony that results from improper employment of photographs by police.[91] In a series of decisions spanning over four decades, the Court has explained the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by improper police arrangement.[92]

The analysis for suppressing eye-witness identifications is a two-part test that first asks (1) whether there was improper police conduct, and if answered affirmatively, then asks (2) whether the improper conduct created the substantial likelihood of misidentification.[93] As the Supreme Court made clear in *Perry v. United States*, "The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct."[94] *Brathwaite*'s key premise is that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive

---

[90] *Id.* at 1–2.

[91] *See Perry v. New Hampshire*, 132 S.Ct. 716, 725-26 (2012); *Simmons v. United States*, 390 U.S. 377, 383-84 (1968) .

[92] *See Perry*, 132 S.Ct. 716 (holding that improper police conduct must be shown before court will screen eyewitness identification evidence for reliability); *Manson v. Brathwaite*, 432 U.S. 98 (1977) (setting forth approach for screening eyewitness identification evidence for reliability if unnecessarily suggestive); *Neil v. Biggers*, 409 U.S. 188 (1972) (providing factors courts consider to determine if eyewitness identification evidence is unreliable); *Simmons*, 390 U.S. 377 (holding that photographic identification evidence should only be suppressed if procedure was so suggestive as to give rise to substantial likelihood of irreparable identification); *Stovall v. Denno*, 388 U.S. 293 (1967) (holding that suggestive but necessary lineup does not violate due process).

[93] *See Perry*, 132 S.Ct. 716.

[94] *Id.* at 726.

14

circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."[95] The Supreme Court held that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."[96] Moreover, even when the police use such a procedure, "suppression of the resulting identification is not the inevitable consequence."[97] Instead, courts must assess, "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification,'"[98] and the "[r]eliability of the eyewitness identification is the linchpin of that evaluation."[99]

Courts are instructed to consider whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification. In *Neil v. Biggers*, the Supreme Court articled a five-factor test for assessing the reliability of eye-witness identifications: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention at the time of the crime; (3) the accuracy of the witness' prior description of the criminal; (4) the witness' level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed between the crime and the confrontation.[100] If after evaluating the reliability of the identification based upon the "totality of the circumstances,"[101] a Court finds that the "'indicators of

---

[95] *Id.* (citing *Brathwaite*, 432 U.S. at 114).

[96] *Id.* at 724 (citing *Brathwaite*, 432 U.S. at 107; *Biggers*, 409 U.S. at 198).

[97] *Id.* (citing *Brathwaite*, 432 U.S. at 112–13; *Biggers*, 409 U.S. at 198-99).

[98] *Id.* (quoting *Biggers*, 409 U.S. at 201).

[99] *Id.* (quoting *Brathwaite*, 432 U.S. at 114).

[100] *Biggers*, 409 U.S. at 199–200; *see also Burbridge*, 252 F.3d at 780; *United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000).

[101] *Brathwaite*, 432 U.S. at 110.

a witness' ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, [then] the identification should be suppressed.'"[102]

The party seeking the suppression of the identification evidence bears the burden of production and persuasion in a suppression hearing to establish that both prongs of the two-step analysis are met.[103] The question of whether identification evidence and the fruits of the identification are admissible at trial is a mixed question of law and fact.[104] Although such mixed questions are subject to *de novo* review, a district court's factual findings are reviewed for clear error.[105] Specifically, the Fifth Circuit "give[s] credence to the credibility choices and findings of fact of the district court unless clearly erroneous."[106]

**B. Analysis**

    *1. Whether Improper Police Conduct Created the Substantial Likelihood of Misidentification*

---

[102] *Perry*, 132 S.Ct. at 725 (quoting *Brathwaite*, 432 U.S. at 114).

[103] *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

[104] *Fletcher*, 121 F.3d at 194 (citing *United States v. Sanchez*, 988 F.3d 1384, 1389 (5th Cir. 1993)).

[105] *Id.* (citing *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 492 (5th Cir. 1995); *United States v. Diecidue*, 603 F.2d 535, 565 (5th Cir. 1979)).

[106] *United States v. Shaw*, 894 F.2d 689, 691 (5th 1990).

As noted above, to succeed on an eyewitness identification suppression motion, a defendant must first prove that law enforcement officials engaged in improper conduct.[107]  Central to this initial inquiry is whether the identification procedure was impermissibly suggestive and whether the suggestive circumstances are attributable to the procedures employed by the police.[108]

Recently, in *Perry*, the Supreme Court reiterated the rationale of deterring improper police conduct underlying its decisions regarding the admissibility of eyewitness identifications under the Due Process Clause.[109] The Supreme Court emphasized, as it had in *Brathwaite*, that the defendant must first establish that improper police conduct created the suggestive identification procedure, before a court will evaluate the reliability of such identification.[110] In *Perry*, the witness identified the defendant in what amounted to a one-person showup when the witness, in response to the officer's request for a more specific description, pointed out of her kitchen window and identified the defendant who was standing next to a police officer.[111] The Supreme Court rejected the defendant's contention that trial judges should be required to "prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances," because "law enforcement officials did not arrange the suggestive circumstances surrounding the defendant's identification" in that case, and the "due process check for reliability . . . comes into play only after the defendant establishes improper police conduct."[112] The Supreme Court reasoned that although the identification was conducted under suggestive circumstances, the police did not engage in any improper behavior, and therefore the

---

[107] *Biggers*, 409 U.S. at 198 (citing *Simmons*, 390 U.S. at 384).

[108] 132 S.Ct. at 728.

[109] *Id.* at 726.

[110] *Id.*

[111] *Id.* at 722.

[112] *Id.* at 725-26.

deterrence rationale was inapposite.[113] The Supreme Court refused to extend its earlier holdings in *Stovall*, *Brathwaite* and *Biggers* to require "a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."[114] As *Perry* made clear, the due process check for reliability of the eyewitness identification evidence is unwarranted "without the taint of improper state conduct."[115]

Although the Supreme Court has noted that "identifications arising from single-photograph displays may be viewed in general with suspicion,"[116] Lewis must first establish that improper police conducted created the suggestive identification procedure before this Court will evaluate the reliability of such an identification. Thus, the Court must first conduct a review of police behavior.

Here, the Government maintains the police acted under exigent circumstances, particularly the need to apprehend armed gunman who likely would flee the jurisdiction. In *Herrera v. Collins*, the Fifth Circuit held that even an "unquestionably suggestive" identification procedure was not "impermissibly suggestive" when employed "in light of the exigent circumstances" of a critically injured victim and a murder suspect who remained at large.[117]

In *Herrera*, the victim was a police officer, Enrique Carrisalez, who had been shot by a driver he had pulled over. The driver was a suspect in a killing that had occurred minutes earlier.[118]

---

[113] *Id.* at 726.

[114] *Id.* at 730.

[115] *Id.* at 728.

[116] *Brathwaite*, 432 U.S. at 116; *see also*, *Simmons v. United States*, 390 U.S. 377, 383 (1968) (noting that risk of witness misidentification "will be increased if the policy display to the witness only the picture of a single individual who generally resembles the person he saw").

[117] *Herrera v. Collins*, 904 F.2d 944, 948–49 (5th Cir. 1990).

[118] *Id.* at 945–46.

The day after the shooting, a witness was shown a photo array featuring six individuals and selected three photos as possibly identifying the shooter.[119] One of the three individuals happened to be the man police had suspected, and two days after the shooting, police visited Carrisalez in his hospital room and showed him a single photograph of Leonel Herrera, the man they suspected in both shootings.[120] Police asked Carrisalez three times if he could identify Herrera as his assailant.[121] Carrisalez nodded yes; he died from his wounds a week later.[122]

The Fifth Circuit affirmed the denial of federal habeas relief on Herrera's claimed grounds that the identification violated his Due Process rights.[123] It reasoned that the procedure did not constitute an impermissibly suggestible identification procedure because "the witness was in the hospital and in serious condition."[124] Moreover, "the perpetrator was known to be armed and still at large; the authorities were faced with the need to apprehend the suspect as quickly as possible."[125]

Here, it is undisputed that the Government visited Smothers in the intensive care unit the day after he suffered multiple gunshot wounds, including one round to the face. Likewise, it is undisputed that no suspect had yet been arrested in the shooting. Therefore, these facts give rise to exigent circumstances similar to those in *Herrera* and support a finding of exigent circumstances that excuse what might be an otherwise "unquestionably suggestive" identification procedure.

---

[119] *Id.* at 946.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.* at 948–49.

[124] *Id.* at 949.

[125] *Id.*

Furthermore, the Court notes that the procedures used in this case were arguably less suggestive than those used in *Herrera*. Smothers was shown several driver's license photos instead of only a single picture, as in *Herrera*.[126] After Smothers saw two photos and identified those individuals as associates of Stewart's, Smothers saw a third photo and identified the individual therein as "Evans."[127] Law enforcement agents, therefore, did not simply show Smothers a single photograph and ask him whether that individual had attacked Smothers. Instead, they showed Smothers a series of photographs against the backdrop of an ongoing drug-conspiracy investigation of Stewart and his associates.[128] Moreover, given the severity of Smothers's condition and the fact that no individuals had yet been arrested in the shooting, exigent circumstances similar to those in *Herrera* existed at the time of the identification. Accordingly, the procedures that led to Lewis's identification by Smothers were not "impermissibly suggestive."

### 2. Whether, Under the Totality of the Circumstances, the Identification is Unreliable

If law enforcement employs an impermissibly suggestive identification procedure, courts must assess the identification itself. As the Supreme Court noted in *Perry*, "Reliability of the eyewitness identification is the linchpin of that evaluation."[129]

Here, even if Lewis is correct in his argument that the procedure constituted an impermissibly suggestive identification by the Government, Lewis still cannot prevail unless he establishes that Smothers's resulting identification is unreliable.[130] To determine whether an

---

[126] Rec. Doc. 509-6 at 3.

[127] *Id.*

[128] *See* Rec. Doc. 509-5 at 25.

[129] *Perry*, 132 S.Ct. at 724 (quoting *Brathwaite*, 432 U.S. at 114).

[130] *See, e.g.*, *Id.* at 726 (noting that purpose of two-step analysis is "to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct.").

impermissibly suggestive identification must be deemed inadmissible, courts are instructed to consider whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification. Thus, this Court will look to *Biggers's* five-factor test discussed above.[131]

### a. Smothers's Opportunity to View His Assailants

The first of the *Biggers* factors looks to the opportunity the witness had to view his assailants.[132] Lewis argues that Smothers "had a very limited and compromised opportunity" to see his assailants at the time of the shooting.[133] He asserts that the shooting occurred in a poorly lighted area and that Smothers would have been too shocked due to his injuries and too frightened due to the "alarming circumstances" to have a sufficient opportunity to view his attackers.[134] The Government contends that this exchange lasted "much longer than mere moments," and, therefore, afforded Smothers ample opportunity to see his attackers.[135]

Allegedly, Smothers was shot in the face soon after seeing the individual stretched across the hood of his car. The description of the attack in the FBI report indicates that Smothers saw Rabbit's companion only after turning his body, whereupon he saw someone extending his arm over the windshield while holding a semi-automatic handgun.[136] Smothers said that he immediately was hit by gunfire and dropped to the ground. Moreover, the NOPD report indicates that Smothers was

---

[131] *Biggers*, 409 U.S. at 199–200; *see also Burbridge*, 252 F.3d at 780; *United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000).

[132] *Id.* at 199.

[133] Rec. Doc. 509-1 at 6.

[134] *Id.*

[135] Rec. Doc. 553 at 11.

[136] Rec. Doc. 509-6 at 5.

crawling toward his car when he observed Rabbit standing over him. In any event, given the scene as he described it from his hospital bed, Smothers did not have much of an opportunity to see the individuals who attacked him.

Nonetheless, Smothers later told detectives that he had known Lewis for several months and that he came upon the scene looking for Stewart.[137] Apparently, Smothers knew the men by appearance. This familiarity with Lewis's appearance indicates that Smothers was sufficiently aware of what Lewis looked like to recognize him on sight. Accordingly, this factor indicates that Smothers's identification is reliable.

### b. Smothers's Degree of Attention at the Time of the Crime

Lewis argues that Smothers's degree of attention was "unquestionably compromised" due to the traumatic nature of the gun battle and the alleged presence of marijuana in Smothers's system. The Government responds that Smothers was sufficiently attentive to accurately identify the make and model of the perpetrator's car and the type of guns they used. In *Joshua v. Maggio*, a case similar to the one at hand, the Fifth Circuit determined that an impermissibly suggestive identification procedure was not substantially unreliable, in part because of the victims' "high degree of attention during the time of the crime" even though the victims had only viewed the suspects "for about two minutes under a street light" and "were physically mistreated and threatened with death."[138]

Here, Smothers's account of the shooting indicates that he arrived at the scene to meet with Stewart to collect money. His attention, therefore, was focused on ensuring that he was meeting with the right people. However little time Smothers had to focus his attention before and during the

---

[137] Rec. Doc. 509-7 at 3.

[138] *Joshua*, 674 F.2d 376, 378 (5th Cir. 1982).

shooting, Smothers apparently was able to focus his attention enough to determine that the shooter was "Evans." Smothers's correct identification of the make, color and model of Stewart's car and Evans's assault rifle further support a finding that Smothers had a high degree of attention during the shooting. The Court finds that this factor weighs in favor of the reliability of Smothers's identification.

### c. Accuracy of Smothers's Prior Description of the Suspect

Before Smothers identified Lewis from the driver's license photograph, the NOPD detective allegedly asked him to describe "Evans."[139] Smothers described Evans as "chubby" with "dreads"[140] Lewis does not dispute that those physical characteristics accurately describe him. Moreover, Smothers did not give any inconsistent statements to the officers about Lewis's appearance. Absent any argument by Lewis that the description of him is inaccurate, the Court finds that this factor also weighs in favor of the reliability of Smothers's identification.

### d. Smothers's Level of Certainty When Identifying Lewis

Lewis acknowledges that Smothers "expressed certainty regarding the identification."[141] Lewis presents no evidence that Smothers lacked certainty during the identification. To the contrary, Smothers immediately identified the person as Lewis when shown Lewis's picture and has never identified anyone else as Stewart's companion that night.[142] Therefore, the Court finds this factor weighs in favor of the reliability of Smothers's identification.

### e. Length of Time Between the Shooting and Smothers's Identification

---

[139] Rec. Doc. 509-5 at 26.

[140] *Id.*

[141] Rec. Doc. 509-1 at 7.

[142] *See* Rec. Doc. 509-7 at 1-2.

The Fifth Circuit has held that a lapse of "only one and one-half weeks" between the crime and photographic identification is not long enough to render "the identification unreliable."[143] Here, the attack on Keys and Smothers occurred at approximately 9:41 p.m. on May 24, 2011. Law enforcement officials interviewed Smother's at around noon the next day.[144] Therefore, Smothers made his identification of Lewis a mere 14 or 15 hours after the crime. This factor also supports finding Smothers's identification to be reliable.[145]

### IV. Conclusion

First, the Court does not find any improper police conduct created substantial likelihood of misidentification here. Further, the Court finds exigent circumstances justified the procedure used.

Moreover, Defendant challenges Smothers's identification on the theory that Smothers was under the influence of narcotics during the shooting, that Smothers might have been heavily medicated when he made the identification, and that his testimony lacks credibility because he is motivated to lie in order to secure his own immunity from prosecution. In analyzing the reliability of the identification, the Court finds Smothers's testimony that he had previously known Lewis particularly compelling. It also finds noteworthy that he accurately described Lewis before being shown a photograph of him and that he identified the weapon used in the attack with specificity. All of the *Biggers* factors indicate that Smothers's identification of Lewis is reliable. Accordingly, the

---

[143] *United States v. Sanchez*, 988 F.2d 1384, 1390 (5th Cir. 1993); *see also McFadden v. Cabana*, 851 F.2d 784, 790 (5th Cir. 1988) (finding lineup conducted "only a few weeks after" robbery was sufficiently reliable).

[144] Rec. Doc. 509-5 at 11, 23.

[145] *See, e.g.*, *McFadden v. Cabana*, 851 F.2d 784, 790 (5th Cir. 1988) (finding lineup conducted "only a few weeks after" a robbery was sufficiently reliable).

Court will deny Lewis's motion to suppress. The Court specifically differentiates the reliability of the identification, at issue here, from the credibility of Smothers's identification. Whether someone was motivated to lie to secure his own immunity or out of retaliation is a credibility call for the jury to decide at trial and not an issue for the Court to decide here.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Lewis's Motion to Suppress Suggestive Identification[146] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this 16th  day of December, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[146] Rec. Doc. 509.

25